**LUM, DRASCO & POSITAN LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 403-9000
*csilva@lumlaw.com*
Attorneys for Defendants First Data Corporation,
TASQ Technology, Inc. and First Data Merchant
Services.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ANGELA STARR, | : | |
| Plaintiff, | : | |
| vs. | : | **NOTICE OF REMOVAL** |
| FIRST DATA CORPORATION, TASQ TECHNOLOGY, INC., FIRST DATA MERCHANT SERVICES, BANC OF AMERICA MERCHANT SERVICES, LLC, JOHN DOES 1-10, JANE DOES 1-10, and DOE BUSINESS ASSOCIATIONS 1-10, | : : : : : : : | |
| Defendants. | : | |

**TO:**   Honorable Judges of the United States District Court
District of New Jersey
Martin Luther King, Jr.
Federal Building and Courthouse
50 Walnut Street
Newark, New Jersey 07102

**ON NOTICE TO:**

CLERK, SUPERIOR COURT OF NEW JERSEY
Hughes Justice Complex
CN-970
Trenton, New Jersey 08625

CLERK, SUPERIOR COURT OF NEW JERSEY
Bergen County Justice Center
10 Main Street
Hackensack, New Jersey 07601

366985

Bruce L. Atkins, Esq.
DEUTSCH ATKINS, P.C.
25 Main Street, Suite 104
Hackensack, New Jersey 07601

Brian D. Lee, Esq.
OGLETREE DEAKINS
10 Madison Avenue, Suite 400
Morristown, New Jersey  07690

**HONORABLE JUDGES:**

Defendants First Data Corporation ("FDC"), TASQ Technology, Inc. ("TASQ"), and First Data Merchant Services ("FDMS") and with the consent of Defendant Banc of America Merchant Services, LLC ("BAMS") notice the removal of this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1446, to the United States District Court for the District of New Jersey, and as grounds therefore show as follows:

## TIMELINESS OF REMOVAL

1.  On January 27, 2012, Angela Starr, ("Plaintiff") filed a civil action against Defendants in the Superior Court of New Jersey, Bergen County, entitled *Starr v. First Data Corporation, et. al.*, BER-L-867-12. (A true and correct copy of the Complaint, Case Information Statement (CIS) and Track Assignment Notice is annexed hereto as *Exhibit A*).

2.  Plaintiff's Complaint alleges the following causes of action: (1) discrimination and retaliation against Plaintiff on the basis of sex in violation of the New Jersey Law Against Discrimination; (2) breach of contract; (3) violation of the implied covenant of good faith and fair dealing; (4) promissory estoppel; (5) equitable estoppel; (6) unjust enrichment; (7) fraud; (8) fraud in the inducement; and (9) quantum meruit.

3.  Defendants received a copy of the Summons and Complaint on February 7, 2012.  (A true and correct copy of the Acknowledgment of Service is annexed hereto as *Exhibit B*).

366985

4.  Plaintiff's Complaint is the only pleading relating to this matter.

5.  As such, in accordance with 28 U.S.C. §§ 1446(a), 1447(b) and 1449, a copy of all pleadings, process, orders and other papers received by Defendants has been attached as *Exhibit A*.

6.  Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal has been timely filed within 30 days after the date on which Defendants were first served with the Summons and Complaint in the state court action.

## VENUE

7.  The Superior Court of New Jersey, Bergen County, is located in the District of New Jersey.

8.  Therefore, venue for purposes of removal is proper because it is the district and division embracing the place where such action is pending.  28 U.S.C. § 1441(a).

## BASIS FOR REMOVAL

9.  This cause is a civil action within the meaning of the Acts of Congress relating to removal of causes.

### *Diversity of Citizenship Jurisdiction*

10. This action is properly removable under 28 U.S.C. §1441 and 28 U.S.C. §1446 because the United States District Court has original jurisdiction in this case under 28 U.S.C. § 1332(a), which provides: "The district courts shall have original jurisdiction of all civil actions arising where the amount in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs, and is between citizens of different states."

11. Plaintiff is a resident of the State of New Jersey.  (*See  Exhibit A* ¶ 3).

12. Defendant First Data Corporation is identified in the Complaint as organized under the laws of the State of Delaware with its principal place of business in Georgia. (*See Exhibit A* ¶ 4).

13. Defendant TASQ Technology, Inc. is identified in the Complaint as organized under the laws of the State of California, with its principal place of business in Georgia. (*See Exhibit A* ¶ 6).

14. Defendant First Data Merchant Services is, and has been at all relevant times, a corporation organized under the laws of the State of Florida[1] with its principal place of business in Georgia.

15. Defendant Banc of America Merchant Services is organized under the laws of the State of Delaware and has a principal place of business in Georgia.

16. Consequently, there is complete diversity for purposes of jurisdiction conferred by 28 U.S.C. § 1332(a).

17. While the Complaint does not specifically quantify Plaintiff's damages, Plaintiff's Counsel has previously represented that Plaintiff's total claimed damages exceeds $75,000.00. (A true and correct copy of Plaintiff's Counsel's letter setting forth Plaintiff's claimed damages is annexed hereto as *Exhibit C*).

18. Accordingly, the amount in controversy in this matter exceeds the jurisdiction requirement exclusive of interest and costs.

## **CONCLUSION**

19. Plaintiff's state court action may be removed pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1446.

---

[1] Defendant First Data Merchant Services is identified in the Complaint as a corporation organized under the laws of the State of California. (*See Exhibit A* ¶ 8).

20. There is diversity of citizenship subject matter jurisdiction for purposes of jurisdiction conferred by 28 U.S.C. § 1332(a)(1) and the amount in controversy exceeds $75,000 exclusive of interests and costs.

21. There have been no other proceedings in the state court action.

22. All defendants consent to the removal of this action.  By removing the within action, Defendants do not waive, or intend to waive, any defenses they might have including forum non-convenience and/or lack of personal jurisdiction, and reserve the right to assert all defenses herein.

23. In accordance with 28 U.S.C. §1446(d), copies of this Notice of Removal have been served upon counsel for Plaintiff, counsel for Defendant Banc of America Merchant Services and filed with the Clerk of the Superior Court of New Jersey and with the Clerk of the Superior Court in Bergen County, New Jersey.

**WHEREFORE**, Defendants First Data Corporation, TASQ Technology, Inc. and First Data Merchant Services respectfully requests that this Honorable Court take jurisdiction of this action and issue all necessary orders and process to remove said action from the Superior Court of New Jersey, Bergen County to the United States District Court for the District of New Jersey.

Respectfully submitted,

**LUM DRASCO & POSITAN, LLC**
Attorneys for Defendants, First Data
Corporation, TASQ Technology, Inc. and
First Data Merchant Services

Dated:  March 5, 2012

By:  s/ Christina Silva _____
Christina Silva

366985                                          5

## LOCAL CIVIL RULE 11.2 CERTIFICATION

I, Christina Silva, Esq., counsel for Defendants First Data Corporation, TASQ Technology, Inc. and First Data Merchant Services certify that the matter in controversy is not the subject of any other action pending in any court nor any pending arbitration or administrative proceeding, and that no other action or arbitration is contemplated.

**LUM DRASCO & POSITAN, LLC**
Attorneys for Defendants, First Data
Corporation, TASQ Technology, Inc. and
First Data Merchant Services

Dated: March 5, 2012

By:  s/ Christina Silva _____
Christina Silva

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 5, 2012 the foregoing Notice of Removal was electronically filed with this Court.  I also certify that on March 5, 2012 a true and correct copy of the foregoing Application was served via overnight mail, upon:

Bruce L. Atkins, Esq.
DEUTSCH ATKINS, P.C.
25 Main Street, Suite 104
Hackensack, New Jersey 07601

Brian D. Lee, Esq.
OGLETREE DEAKINS
10 Madison Avenue, Suite 400
Morristown, New Jersey  07690

CLERK, SUPERIOR COURT OF NEW
JERSEY
Hughes Justice Complex
CN-970
Trenton, New Jersey 08625

And Via Hand Delivery to:

CLERK, SUPERIOR COURT OF NEW JERSEY
Bergen County Justice Center
10 Main Street
Hackensack, New Jersey 07601

**LUM DRASCO & POSITAN, LLC**
Attorneys for Defendants, First Data
Corporation, TASQ Technology, Inc. and
First Data Merchant Services

Dated:  March 5, 2012

By:  <u>s/ Christina Silva</u>
Christina Silva

366985                                    7



**DEUTSCH ATKINS, P.C.**
25 Main Street, Suite 104
Hackensack, New Jersey 07601
(201) 498-0900
Attorneys for Plaintiff, Angela Starr

| | |
|---|---|
| ANGELA STARR, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION: BERGEN COUNTY |
| | DOCKET NO.: BER-L |
| v. | |
| FIRST DATA CORPORATION, TASQ TECHNOLOGY, INC., FIRST DATA MERCHANT SERVICES, BANC OF AMERICA MERCHANT SERVICES, LLC, JOHN DOES 1-10, JANE DOES 1-10, and DOE BUSINESS ASSOCIATIONS 1-10, | Civil Action |
| | **COMPLAINT** |
| | **AND JURY DEMAND** |
| Defendants. | |

Plaintiff Angela Starr ("Plaintiff"), residing at 109 Paul Court, in the Township of River

Vale, County of Bergen, State of New Jersey, by way of Complaint says the following:

## NATURE OF THIS ACTION

1.      Plaintiff brings this action against Defendants First Data Corporation ("First

Data") and TASQ Technology, Inc. ("TASQ") to remedy breach of contract, violation of the

implied covenant of good faith and fair dealing, promissory estoppel, equitable estoppel, unjust

enrichment, fraud, fraud in the inducement and quantum meruit. Plaintiff brings action against

Defendants First Data, First Data Merchant Services ("FDMS"), and Banc of America Merchant

Services ("BAMS") to remedy sex discrimination and retaliation in violation of the New Jersey

Law Against Discrimination, N.J.S.A. 10:5-1, et seq. ("NJLAD"), breach of contract and

violation    of    the    implied    covenant    of    good    faith    and    fair    dealing.

**PARTIES**

2.     Plaintiff repeats and realleges all the allegations set forth in the preceding paragraphs as if fully set forth herein.

3.     During all times relevant to these causes of action, Plaintiff worked for Defendants First Data, TASQ, FDMS and BAMS from her home office located at 109 Paul Court, in the Township of River Vale, County of Bergen, State of New Jersey.

4.     Upon information and belief, Defendant First Data is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 5565 Glenridge Connector NE, Suite 2000 Atlanta, Georgia.

5.     Upon information and belief, Defendant First Data transacts business throughout the State of New Jersey and elsewhere, and maintains offices at 125 Belmont Drive, Somerset, New Jersey, Somerset County, State of New Jersey.

6.     Upon information and belief, Defendant TASQ, a wholly-owned subsidiary of Defendant First Data, is a corporation organized and existing under the laws of California, with its principal place of business located at 1169 Canton Road, Marietta, Georgia.

7.     Upon information and belief, Defendant TASQ transacts business throughout the State of New Jersey.

8.     Upon information and belief, Defendant FDMS, a wholly-owned subsidiary of Defendant First Data, is a corporation organized and existing under the laws of California, with its principal place of business located at 5565 Glenridge Connector NE, Suite 2000 Atlanta, Georgia.

2

9.      Upon information and belief, Defendant FDMS transacts business throughout the State of New Jersey and elsewhere and maintains offices at 777 Central Boulevard, Borough of Carlstadt, County of Bergen, State of New Jersey.

10.     Upon information and belief, Defendant BAMS has its principal place of business at 1231 Durrett Lane, Louisville, Kentucky, does business throughout the State of New Jersey and elsewhere, and maintains offices at 777 Central Boulevard, Borough of Carlstadt, County of Bergen, State of New Jersey.

11.     Upon information and belief, Defendant BAMS is a joint venture of Defendant First Data and Bank of America, which is approximately 46.5 percent owned by Bank of America and 48.5 percent owned by Defendant First Data.

## JURISDICTION AND VENUE

12.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

13.     The Court has jurisdiction over Defendants based upon the facts that Defendants conducted business in Bergen County, New Jersey.  In addition, at all times that Plaintiff was employed by all Defendants, she worked out of her home in River Vale, Bergen County, New Jersey.

14.     Venue in Bergen County is also appropriate based upon the facts that Defendants engaged in and conducted transactions in Bergen County New Jersey, have offices in New Jersey, and because Plaintiff worked for Defendants in Bergen County, New Jersey.

## FACTUAL ALLEGATIONS

A.      **Plaintiff's Employment with Defendants First Data and TASQ**

3

15.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

16.    From November 2002 until January 2006, Defendant First Data employed Plaintiff in the position of National Account Executive, responsible exclusively for Tier One National Sales.

17.    From September 2006 until December 31, 2008, Plaintiff was employed by Defendants First Data and TASQ in the position of Regional Sales Manager.

18.    Commencing on or about September 1, 2006, the terms of Plaintiff's commission payments were set forth in a 2006 Commission Plan (the "2006 Plan").

19.    Pursuant to the terms of the 2006 Plan, Plaintiff was to be paid a commission of 4.77% on all new sales revenue she generated on behalf of TASQ.

20.    Pursuant to the 2006 Plan, Plaintiff was also entitled to paid commissions on all revenue generated for at least a twelve (12) month period from the account's "Go Live" date.

21.    On or about May 18, 2008, O.B. Rawls IV, Senior Vice President of Sales ("Rawls"), notified Plaintiff that her quota for 2008 would be $3,600,000.00, a 330% increase over 2007.

22.    On or about July 10, 2008, without explanation, Mr. Rawls presented Plaintiff with a new Compensation Plan (the "2008 Plan").

23.    The terms of the 2008 Plan reduced Plaintiff's commission rate from 4.77% to 1.00%.

24.    Mr. Rawls then notified Plaintiff that the 2008 Plan would apply retroactively to all deals Plaintiff signed, beginning on January 1, 2008.

4

25.     Reasonably believing that a retroactive change to her commission plan was illegal, Plaintiff objected to the 2008 Plan particularly in view of the fact that she had already completed a substantial volume of her overall 2008 sales between January and July 2008.

26.     On or about July 25, 2008, Mr. Rawls e-mailed Plaintiff a document showing a proposed commission payout for Plaintiff for the "first half" of 2008, notifying her that the 2006 Plan had terminated, and setting forth the new 2008 Plan, which became effective on July 1, 2008. Mr. Rawls advised Plaintiff that the 2008 Plan superseded any and all past plans.

27.     Plaintiff refused to sign the 2008 Plan, and repeatedly objected to any retroactive reduction to her January to July 1, 2008 commissions.

28.     Thereafter, Plaintiff and Kimberly Fitzsimmons, President of First Data Independent Sales, spoke by telephone, during which call Ms. Fitzsimmons agreed with Plaintiff that any deal Plaintiff signed under the 2006 Plan should be paid out for the full duration as stated in the plan they were signed under, as this process had always been the standard course for all First Data divisions and, per Ms. Fitzsimmons, was "only fair."

29.     On or about August 27, 2008, Plaintiff sent Mr. Rawls a detailed e-mail, objecting to the retroactive application of the 2008 Plan to deals signed prior to July 1, 2008. However, Mr. Rawls remained unrelenting in his efforts to deprive Plaintiff of the full value of earned commissions under the 2006 Plan on sales completed prior to July 1, 2008.

30.     In or about September 2008, Plaintiff advised Ms. Fitzsimmons that, as a result of Mr. Rawl's retaliatory conduct in response to her objections to the 2008 Plan, she was considering a transfer to a sales position with Defendant First Data Merchant Services ("FDMS"), another subsidiary of Defendant First Data.

31.     On numerous occasions in late 2008, Ms. Fitzsimmons assured Plaintiff that a transfer to FDMS was a transfer within the Defendant First Data organization, and if Plaintiff pursued the transfer, she would not forfeit any commissions on the basis that she had left the Company, and that she would continue to be paid all commissions for their full payout period pursuant to the 2006 Plan.

32.     Jonathan Maule of Defendant First Data's Human Resources department also confirmed Ms. Fitzsimmons' representations with regard to payment of Plaintiff's commissions on no less than three separate occasions.

33.     On or about October 30, 2008, Mr. Rawls presented Plaintiff with another version of the 2008 Plan, with terms in direct contravention to what she was told by Ms. Fitzsimmons regarding her commission payments.  Further, Mr. Rawls told Plaintiff that the Company would not pay her for third quarter commissions which were due to be paid in the November 15, 2008 payroll.

34.     Plaintiff immediately objected to Mr. Rawls' statement, which was contrary to the repeated assurances Ms. Fitzsimmons and Mr. Maule provided to her.

35.     In or about early November 2008, Plaintiff confirmed to Ms. Fitzsimmons that she had received her formal offer to move to Defendant FDMS, which she wanted to accept, but only with Ms. Fitzsimmons' confirmation that she would be paid all commissions due through their duration, and detailed several specific, hypothetical examples for Ms. Fitzsimmons in order to ensure that both Plaintiff and Ms. Fitzsimmons fully understood that the payout would continue far beyond the transfer.

6

36.     Ms. Fitzsimmons told Plaintiff to accept the job, and to not worry because Plaintiff would still be employed with Defendant First Data, and that it was standard policy that commissions would continue to be paid when an employee moves from one division to another within Defendant First Data.

37.     Mr. Maule, Brett Narlinger and Plaintiff's new supervisor, Kevin Powers, also confirmed to Plaintiff that it was standard policy to continue to pay an employee commissions when that employee transferred within Defendant First Data's corporate entities.

38.     Mr. Maule encouraged Plaintiff to accept the position with FDMS.

39.     In reliance upon the foregoing representations, Plaintiff accepted the position with Defendant FDMS with a commencement date of January 1, 2009.

40.     When Plaintiff finally received a portion of her TASQ commissions, after her January 1, 2009 transfer to Defendant FDMS, she received a reduced fourth quarter commission, and no commission for the first and second quarters of 2009, contrary to the numerous assurances she had received from Ms. Fitzsimmons, Mr. Maule and Mr. Narlinger, as described above.

41.     On or about January 19, 2009, Plaintiff reminded Ms. Fitzsimmons in an e-mail that she "based [her] decision to move to National [FDMS] only *after* confirming with you, Brett [Narlinger] and Kevin [Powers] that [Plaintiff] would continue to be paid commission for the duration of the payout that were signed at TASQ."

42.     Pursuant to the 2006 Plan, Plaintiff was entitled to commissions from sales to Innovative Merchant Solutions (a/k/a Intuit) (the "Intuit Deal"), TD Bank (the "TD Bank Deal), Bank of America RDS, (the "Bank of America RDS Deal"), Commerce Bank (the "Commerce Bank Deal"), Hillcrest Bank (the "Hillcrest Bank Deal"), Flagship Merchant Services (the

7

"Flagship Merchant Services Deal"), CoBiz ("the CoBiz Deal"), and Continental Credit Systems (the "Continental Credit Systems Deal").

43.     Upon information and belief, Plaintiff has not received any of the commissions to which she is entitled for the deals referenced in the preceding paragraph, among others.

44.     Defendants First Data and TASQ have violated the 2006 Plan by refusing to pay Plaintiff for the commissions due and owed to her for the deals referenced in the paragraph 42, supra.

45.     As set forth in paragraph 20, supra, Defendants First Data and TASQ were also to have paid Plaintiff commissions for at least a 12-month period after the "Go Live" date for each deal requiring Defendants to pay Plaintiff commissions through 2009, which Defendants failed to do.

**B.      Plaintiff's Employment with Defendants First Data, FDMS and BAMS**

46.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

47.     Plaintiff commenced employment with Defendant FDMS on or about January 1, 2009 in the position of National Account Executive, responsible for Tier One National Sales.

48.     In or about March 2009, Defendant FDMS reorganized its sales force.

49.     As a result, Edward A. Labry III, President of Defendant First Data, promoted male employee, Eric Hoffman, from a Senior Account Executive to Senior Vice President of the newly created Northeast Region.

50.     At that time of his promotion, Mr. Hoffman had been employed with Defendant FDMS for only two years, and had no prior management experience with Defendant FDMS. Plaintiff was assigned to the Northeast Region.

51.     Also in or about March 2009, Plaintiff interviewed for a Sales Manager position reporting to Mr. Hoffman.

52.     However, Mr. Hoffman told Plaintiff that he could not promote her, and placed less-qualified male employees, Kenny Whitlock and Rob Winokur, who were Tier Two sales managers at the time, into the two available Sales Manager positions.

53.     Mr. Hoffman, who had identified Plaintiff as a top producer in Tier One National Sales, divided the most significant Tier One accounts between Plaintiff and a male, Kyle Robinson.

54.     In or about June 2009, Defendant FDMS allowed Mr. Hoffman to hire two of his personal friends, Matt Weiss and Tom Brown, both males with little or no prior industry or product experience. Mr. Hoffman did not offer either of the Sales Manager positions to Plaintiff.

55.     In or about June 30, 2009, Defendants First Data and FDMS began a joint venture with Bank of America, which became Defendant BAMS.   Thereafter, Plaintiff became an employee of Defendant BAMS.

56.     Shortly thereafter, Steven Herrmann replaced Mr. Hoffman as the Senior Vice President of Northeast Sales.

57.     On or about October 20, 2009, Plaintiff learned that Defendant BAMS had reorganized its sales force into Large Corporate (formerly Tier One) and Commercial, which included all other customers (Tier Two and lower).

9

58.     In or about October 2009, Plaintiff was made into a scapegoat regarding an unprofitable Bed Bath and Beyond Renegotiation ("BB&B Renegotiation"), in which Plaintiff was not responsible for.  The Defendants' asserted rationale for not to placing Plaintiff on the Large Corporate Team in or about October 2009 due to her role in the BB&B Renegotiation was a pretext for discrimination.

59.     Plaintiff's sales success and outstanding performance notwithstanding, Defendant BAMS assigned Plaintiff to the Commercial Team, which was effectively a demotion, providing less income opportunity and significantly smaller accounts.

60.     Defendant BAMS' decision to assign Plaintiff to the Commercial Division and not to the Corporate Division was based upon her gender. This discriminatory job action is evidenced by the assignment of several less-qualified or as-qualified males, among others, to the Large Corporate Team, including but not limited to, Tom Brown, Paul Tollesford, Steve Byrnes, Michael Lederman, Jonathan Murray, and Jim Stanley.

61.     In particular, Defendant BAMS ultimately assigned Mr. Brown responsibility for at least seven (7) of Plaintiff's Large Corporate accounts, including Tiffany & Co., LVMH, Polo RL, Barney's New York, Dress Barn, Coach and J. Crew.

62.     Defendant BAMS' all male management team joined in with Mr. Herrmann's discriminatory decision to deny Plaintiff a position on the Large Corporate Retail Team, and to give Plaintiff's accounts to less-qualified or as-qualified male account executives.

63.     Plaintiff's objections to her demotion to the Commercial Team, and her appeals to be placed on the Large Corporate Team commensurate with her experience, professional

reputation, existing pipeline and potential Large Corporate sales, immediately triggered a retaliatory response by Defendant BAMS' management.

64. For example, on or about November 20, 2009, Timothy Munto, Defendant BAMS' Senior Vice President Commercial Sales, berated Plaintiff for "going over [his] head" when he learned that she had spoken with Mr. Narlinger the prior month, when she had first learned of her demotion, and told Plaintiff that she "thinks pretty highly of [her]self."

65. On or about January 5, 2010, Mr. Brown notified Plaintiff that he was acquiring seven (7) of her Large Corporate Retail accounts.

66. On or about January 7, 2010, Mr. Whitlock notified Plaintiff while she was on-site at Toys-R-Us, that Mr. Herrmann had ordered that she be removed from the Toys-R-Us account, despite having told Plaintiff two (2) days earlier that a meeting would be taking place the following weekend regarding her prospective deals with Toys-R-Us.

67. As a result of the foregoing discrimination and retaliation, on or about January 8, 2010, Plaintiff submitted a formal complaint of gender discrimination and retaliation to Marian Wilson in Defendant BAMS' Human Resources department, copying Messrs. Narlinger, Munto, Whitlock and Maule on her complaint.

68. In her complaint, Plaintiff detailed the foregoing discriminatory and retaliatory circumstances. In conclusion, Plaintiff advised Ms. Wilson that Defendant BAMS had created a hostile work environment.

69. Thereafter, Defendant BAMS conducted a sham investigation into Plaintiff's complaint, and the retaliation continued thereafter.

11

70.     For example, Mr. Munto told Plaintiff, among other things, that as a result of her complaints, she "no longer had the support of anyone in the organization anymore."

71.     Another example of the retaliation Plaintiff faced was when Mr. Narlinger falsely accused Plaintiff of asking at least eight (8) customers to approach Mr. Narlinger at an event to ask him to keep Plaintiff on their accounts.

72.     Plaintiff was constructively discharged on or about February 1, 2010 because Defendant BAMS created a work environment for Plaintiff in which no reasonable person could continue to remain employed.

## COUNT ONE

## BREACH OF CONTRACT

73.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

74.     In or about September 2006, Defendants First Data and TASQ and Plaintiff entered into the 2006 Plan described in paragraphs 19 to 21, supra.

75.     Plaintiff performed her obligations to Defendants First Data and TASQ for the benefit of those Defendants, as well as the benefit due and owed to Plaintiff on the deals she signed including, but not limited to, the Intuit Deal, the TD Bank Deal, the Bank of America RDS Deal, the Commerce Bank Deal, the Hillcrest Bank Deal, the Flagship Merchant Services Deal, the CoBiz Deal, and the Continental Credit Systems Deal, pursuant to the 2006 Plan.

76.     Defendants First Data and TASQ failed to pay Plaintiff the commissions owed to her on the deals she signed, as referenced to in the preceding paragraph.

12

77.     In refusing to pay Plaintiff the commission due and owing her on the above-referenced deals, Defendants First Data and TASQ breached the 2006 Plan with Plaintiff.

78.     Defendants' breach of the 2006 Plan with regard to the above-referenced deals caused Plaintiff to suffer economic losses.

79.     Upon information and belief, Defendants First Data and TASQ have also refused to pay Plaintiff commissions due and owed to her for new deals signed in 2008, pursuant to the 2006 Plan.

80.     As set forth in paragraph 20, <u>supra</u>, Defendants First Data and TASQ were also to have paid Plaintiff commissions for a 12-month period after the "Go Live" date for each deal requiring Defendants to pay Plaintiff commissions through 2009.

81.     By refusing to pay her commissions due and owed to her through 2009, Defendants First Data and TASQ breached the 2006 Plan with Plaintiff.

82.     Plaintiff has suffered economic losses as a result of the Defendants' breach of contract with her.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

(a)     Compensatory damages;

(b)     Interest and costs of suit; and

(c)     Such other relief as the Court may deem equitable and just.

## COUNT TWO

### VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

13

83.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

84.    The 2006 Plan between Defendants First Data and TASQ and Plaintiff had an implied covenant of good faith and fair dealing by which Defendants agreed to do nothing to deprive Plaintiff of the benefit of the 2006 Plan and to give Plaintiff full cooperation and benefit of that Plan.

85.    By attempting to retroactively apply the 2008 Plan to the period January to July 2008, thereby depriving Plaintiff of payment under the 2006 Plan for deals signed under that Plan, Defendants First Data and TASQ breached the implied covenant of good faith and fair dealing.

86.    By depriving Plaintiff of payments due and owed to her under the 2006 Plan for deals signed in 2008, Defendants First Data and TASQ further breached the implied covenant of good faith and fair dealing.

87.    At all relevant times, Defendants First Data and TASQ knew that Plaintiff depended upon her commissions as a means of financial support.

88.    Defendant First Data's and TASQ's conduct has destroyed and/or injured the rights of Plaintiff under the terms of the 2006 Plan.

89.    As a direct and proximate result of the above breach of the implied covenant of good faith and fair dealing in the 2006 Plan, Plaintiff has suffered and will continue to suffer substantial monetary damages in an amount to be determined.

90.    Plaintiff is informed and believes, and, therefore, alleges that, in an attempt to retroactively impose the 2008 Plan on deals signed between January and the Summer of 2008 under the 2006 Plan, and refusing to pay her commissions on deals signed in 2008 under the 2006

14

Plan, Defendants First Data and TASQ were acting maliciously, oppressively, in bad faith, and with a conscious and reckless disregard of Plaintiff's rights, in a manner that warrants assessment of punitive damages pursuant to the New Jersey Punitive Damages Act, <u>N.J.S.A.</u> 2A:15-5.9, <u>et seq.</u>

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

    (a)    Compensatory damages for financial loss of commissions;

    (b)    Punitive damages;

    (c)    Attorneys' fees, interest and costs of suit; and

    (d)    Such other relief as the Court may deem equitable and just.

**COUNT THREE**

**<u>PROMISSORY ESTOPPEL</u>**

91.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

92.    Defendants First Data and TASQ made numerous clear and definite promises to Plaintiff to pay her commissions on deals she signed prior to the summer of 2008, which would be calculated by the methods set forth in the 2006 Plan.

93.    On numerous occasions in 2008, TASQ President Ms. Fitzsimmons and Mr. Maule assured Plaintiff that she would be paid on all deals signed prior to the summer of 2008, in accordance with the terms of the 2006 Plan.

94.    Likewise, Ms. Fitzsimmons and Mr. Maule confirmed that Plaintiff would be paid those commissions under the entirety of their payout period even if Plaintiff accepted a transfer out of TASQ to First Data division, First Data Merchant Services.

15

95.     Defendants First Data, Ms. Fitzsimmons and Mr. Maule made these promises with the reasonable expectation that Plaintiff would rely upon them.

96.     Plaintiff reasonably relied upon the aforementioned promises made by Defendants and their agents.

97.     As a result of Plaintiff's reasonable reliance upon Defendant First Data's and TASQ's promises, she incurred substantial detriment.

98.     As a direct and proximate result of Defendants' clear and definite promises made to Plaintiff, the latter has been substantially damaged.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

    (a)    Compensatory damages for financial loss and emotional distress;

    (b)    Punitive damages;

    (c)    Attorneys' fees, interest and costs of suit; and

    (d)    Such other relief as the Court may deem equitable and just.

## COUNT FOUR

### EQUITABLE ESTOPPEL

99.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

100.    During Plaintiff's nearly three year tenure with Defendants First Data and TASQ, Defendants adhered to the 2006 Plan commission formula for a significant number of transactions which Plaintiff completed on Defendants' behalf.

101.   Plaintiff reasonably relied on these facts and believed that, for the deals described in paragraph 42, <u>supra</u>, Defendants First Data and TASQ would adhere to the 2006 Plan commission formula.

102.   Similarly, Plaintiff reasonably relied on these facts and believed that, Defendants First Data and TASQ would pay her commissions on deals signed in 2008 for a twelve (12) month period from the deals' "Go Live" date(s).

103.   Defendants First Data and TASQ are, therefore, estopped from denying the commission formula which, under the 2006 Plan, should be utilized in calculating the compensation owed to Plaintiff.

**WHEREFORE,** cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

(a)   Compensatory damages for financial loss and emotional distress;

(b)   Punitive damages;

(c)   Attorneys' fees, interest and costs of suit; and

(d)   Such other relief as the Court may deem equitable and just.

## COUNT FIVE

### UNJUST ENRICHMENT

104.   Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

105.   Upon information and belief, Defendants First Data and TASQ received a benefit, and will continue to receive benefits, as a result of Plaintiff's 2008 efforts to obtain and succeed in

17

securing deals on behalf of Defendants First Data and TASQ, on which Plaintiff is entitled to receive all of her commissions due, pursuant to the terms of the 2006 Plan.

106.   The failure of Defendants First Data and TASQ to pay Plaintiff the benefit of the commissions owed to her has enriched Defendants beyond its contractual rights at the expense of, and to the detriment to, Plaintiff.

107.   Defendants' retention of the commissions owed to Plaintiff for deals signed in 2008 would be unjust.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

(a)   Compensatory damages for financial loss;

(b)   Punitive damages;

(c)   Attorneys' fees, interest and costs of suit; and

(d)   Such other relief as the Court may deem equitable and just.

## COUNT SIX

### FRAUD

108.   Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

109.   Defendants First Data and TASQ falsely represented to Plaintiff that they would pay her for any commissions earned under the 2006 Plan, in accordance with the terms of that Plan.

110.   Defendants First Data and TASQ made the aforementioned false representation to Plaintiff knowing that they did not intend to pay Plaintiff commissions earned prior to the summer of 2008 in accordance with the terms of the 2006 Plan.

18

111.   Defendants First Data and TASQ intended to and did deceive Plaintiff with its false representation.

112.   Defendants engaged in affirmative misrepresentation and deliberate suppression of information, in allowing Plaintiff to sign deals under the 2006 Plan, between January and July 2008, of which Defendants have benefitted and continue to benefit, knowing that they would deny Plaintiff commission to which she was entitled to under the 2006 Plan.

113.   Defendants First Data and TASQ made the aforesaid false and fraudulent misrepresentations to Plaintiff for the purpose of enriching themselves by using Plaintiff to sign deals, including, but not limited to, the deals referenced in paragraph 42, supra, on behalf of Defendants First Data and TASQ, and then refusing to pay Plaintiff the commissions owed to her for acquiring those deals.

114.   Plaintiff believed and justifiably relied upon Defendants First Data's and TASQ's false representations, and was induced by them to take action to secure deals on behalf of Defendants First Data and TASQ.

115.   As a result of Plaintiff's reliance upon Defendants' aforesaid false and fraudulent representations to her detriment, she has sustained economic damages.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

(a)   Compensatory damages;

(b)   Punitive damages;

(c)   Attorneys' fees, interest and costs of suit; and

(d)   Such other relief as the Court may deem equitable and just.

19

## COUNT SEVEN

## FRAUD IN THE INDUCEMENT

116.   Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

117.   Defendants First Data and TASQ induced Plaintiff to continue her employment based upon the false representation that she would be paid on commissions earned in accordance with the terms of the 2006 Plan.

118.   Defendants First Data and TASQ further induced Plaintiff to take the National Sales position with FDMS by promising her that she would be paid all commissions previously owed by TASQ, as well as all commissions going forward.

119.   Defendants First Data and TASQ at all times knew that the above representations were untrue, but knew that the only way that they could induce Plaintiff to continue her employment was to represent to her that she would be paid on her earned commissions in accordance with the terms of the 2006 Plan.

120.   Defendants knew at the time that they made their representations to Plaintiff that they did not intend to pay Plaintiff for her earned commissions in accordance with the terms of the 2006 Plan, and did so with the sole purpose of inducing the Plaintiff to continue her employment with Defendants, which Plaintiff relied upon to her detriment.

121.   Plaintiff has suffered damages as a result of her reliance upon Defendants' representation.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and/or severally, for the following relief:

(a)    Compensatory and consequential damages;

(b)    Punitive damages;

(c)    Interest;

(d)    Costs of suit;

(e)    Attorney's fees; and

(f)    Such other relief as the Court may deem equitable and just.

## COUNT EIGHT

## <u>QUANTUM MERUIT</u>

122.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

123.    Plaintiff performed the services requested and expected of her by Defendants First Data and TASQ in good faith, resulting in the signing of deals in 2008, as described in paragraph 42, <u>supra</u>.

124.    Plaintiff performed those services for the benefit of Defendants First Data and TASQ, which First Data and TASQ accepted for their benefit.

125.    Plaintiff had an expectation to be compensated for rendering the aforementioned services pursuant to the terms of the 2006 Plan.

126.    Plaintiff is entitled to the reasonable value of those services.

127.    The reasonable value of the services to which Plaintiff is entitled may be ascertained based upon methods of commission calculation set forth the 2006 Plan, and the actual value of the deals Plaintiff signed in 2008.

21

**WHEREFORE,** cause having been shown, Plaintiff demands judgment against Defendants First Data and TASQ, jointly and severally, and seeks the following relief:

    (a)    Compensatory damages;

    (b)    Punitive damages;

    (c)    Attorneys' fees, interest and costs of suit; and

    (d)    Such other relief as the Court may deem equitable and just.

## COUNT NINE

### SEX DISCRIMINATION IN VIOLATION OF THE
### NEW JERSEY LAW AGAINST DISCRIMINATION

128.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

129.    The New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. ("NJLAD") makes it unlawful to discharge or discriminate against an employee because of their sex.

130.    Based on the foregoing, the actions of Defendants First Data, FDMS and BAMS, as set forth above, constitute discrimination on the basis of Plaintiff's sex in violation of the NJLAD.

131.    Based on the foregoing, Defendants First Data, FDMS and BAMS recklessly and/or intentionally failed to take prompt, appropriate and/or reasonable remedial action to prevent, stop and remedy the sex discrimination directed at Plaintiff.

132.    By and through its agents, Defendants First Data, FDMS and BAMS, fostered a harassing and discriminatory atmosphere and allowed actions which constitute harassment and discrimination on the basis of Plaintiff's sex in violation of the NJLAD, constructively terminating Plaintiff from her employment.

22

133.    As a direct and proximate result of Defendants' aforesaid discriminatory conduct, Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits, mental and emotional distress, stress, humiliation, damage to reputation, and harm to her career development.

134.    The conduct of Defendants First Data, FDMS and BAMs was egregious, willful, wanton and in reckless disregards of Plaintiff's rights, such as to justify an award of punitive damages.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data, FDMS, and BAMS, jointly and severally, and seeks the following relief:

(a)    Compensatory damages for loss of wages and benefits, mental and emotional distress, stress, humiliation, damage to reputation, and harm to her career development;

(b)    Reimbursement for medical expenses;

(c)    Punitive damages;

(d)    Attorneys' fees, interest and costs of suit; and

(e)    Such other relief as the Court may deem equitable and just.


### COUNT TEN

### RETALIATION IN VIOLATION OF THE
### NEW JERSEY LAW AGAINST DISCRIMINATION


135.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

136.    The NJLAD prohibits retaliation against an employee who complains about sex discrimination.

137.    Plaintiff reasonably believed that the conduct of Defendants First Data, FDMS and BAMS, as set forth above, constituted sex discrimination in violation of the NJLAD.

138.    Plaintiff complained to Defendants First Data, FDMS and BAMS about the discrimination she suffered while in their employ.

139.    As a result of her complaints, Plaintiff was retaliated against in numerous ways including, but not limited to, further harassment and constructive termination of her employment.

140.    As a direct and proximate result of Defendants' aforesaid discriminatory conduct, Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits, mental and emotional distress, stress, humiliation, damage to reputation, and harm to her career development.

141.    The conduct of Defendants First Data, FDMS and BAMS was egregious, willful, wanton and in reckless disregards of Plaintiff's rights, such as to justify an award of punitive damages.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data, FDMS, and BAMS, jointly and severally, and seeks the following relief:

      (a)    Compensatory damages for loss of wages and benefits, mental and emotional distress, stress, humiliation, damage to reputation, and harm to her career development;

      (b)    Reimbursement for medical expenses;

      (c)    Punitive damages;

(d)    Attorneys' fees, interest and costs of suit; and

(e)    Such other relief as the Court may deem equitable and just.

## COUNT ELEVEN

### BREACH OF CONTRACT

142.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

143.    Defendants First Data, FDMS, and BAMS entered into a contract with Plaintiff to pay her commissions for the sales she procured during her employment with those Defendants.

144.    Plaintiff performed her obligations under the contract to Defendants First Data, FDMS and BAMS for the benefit of Defendants First Data, FDMS and BAMS.

145.    Defendants First Data, FDMS and BAMS failed to pay Plaintiff the commissions owed to her on the deals she signed during her employment with Defendants First Data, FDMS and BAMS.

146.    As a result of the breach of contract with Plaintiff by Defendants First Data, FDMS and BAMS, Plaintiff was caused to suffer economic losses.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data, FDMS and BAMS, jointly and severally, and seeks the following relief:

(a)    Compensatory damages;

(b)    Interest and costs of suit; and

(c)    Such other relief as the Court may deem equitable and just.

## COUNT TWELVE

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

25

147.   Plaintiff repeats and realleges each and every allegation set forth above as if set forth at length herein.

148.   The agreement between Defendants First Data, FDMS, BAMS and Plaintiff contained an implied covenant of good faith and fair dealing by which Defendants agreed to, among other things, do nothing to deprive Plaintiff of her earned commissions.

149.   By depriving Plaintiff of payments due and owed to her, Defendants First Data, FDMS and BAMS breached the implied covenant of good faith and fair dealing.

150.   Defendants' conduct has destroyed and/or injured the rights of Plaintiff under the terms of the agreement.

151.   As a direct and proximate result of the above breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and will continue to suffer substantial monetary damages in an amount to be determined.

152.   Defendants First Data, FDMS and BAMS were acting maliciously, oppressively, and in bad faith, with a conscious and reckless disregard of Plaintiff's rights, in a manner that warrants assessment of punitive damages pursuant to the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants First Data, FDMS and BAMS, jointly and severally, and seeks the following relief:

(a)   Compensatory damages for financial loss of commissions;

(b)   Punitive damages;

(c)   Attorneys' fees, interest and costs of suit; and

(d)   Such other relief as the Court may deem equitable and just.

26

DEUTSCH ATKINS, P.C.
Attorneys for Plaintiff, Angela Starr

By: _____
BRUCE L. ATKINS

Dated: January 27, 2012


## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

DEUTSCH ATKINS, P.C.
Attorneys for Plaintiff, Angela Starr

By: _____
BRUCE L. ATKINS

Dated: January 27, 2012


## DESIGNATION OF TRIAL COUNSEL

Bruce L. Atkins, Esq. is hereby designated as trial counsel pursuant to R. 4:5-1(c).

DEUTSCH ATKINS, P.C.
Attorneys for Plaintiff, Angela Starr

By: _____
BRUCE L. ATKINS

Dated: January 27, 2012

27

### R. 4:5-1 CERTIFICATION

Pursuant to R. 4:5-1, the undersigned certifies that, to the best of his knowledge, the within matters in controversy are not the subject of any other action pending in any other court or of a pending arbitration proceeding nor is any action or arbitration proceeding contemplated nor are other parties required to be joined in this action.

_____
BRUCE L. ATKINS

Dated: January 27, 2012

28

)                                    )

**Appendix XII-B1**

| | |
|---|---|
| **CIVIL CASE INFORMATION STATEMENT (CIS)**<br><br>Use for Initial Law Division<br>Civil Part pleadings (not motions) under *Rule* 4:5-1<br>Pleading will be rejected for filing, under *Rule* 1:5-6(c),<br>if information above the black bar is not completed<br>or attorney's signature is not affixed | **FOR USE BY CLERK'S OFFICE ONLY**<br>PAYMENT TYPE: ☐ CK ☐ CG ☐ CA<br>CHG/CK NO.<br>AMOUNT:<br>OVERPAYMENT:<br>BATCH NUMBER: |

| ATTORNEY / PRO SE NAME<br>Bruce L. Atkins, Esq. | TELEPHONE NUMBER<br>(201) 498-0900 | COUNTY OF VENUE<br>Bergen |
|---|---|---|
| FIRM NAME (if applicable)<br>Deutsch Atkins, P.C. | | DOCKET NUMBER (when available) |
| OFFICE ADDRESS<br>25 Main Street, Suite 104<br>Court Plaza North<br>Hackensack, New Jersey  07601 | | DOCUMENT TYPE<br>Complaint & Jury Demand |
| | | JURY DEMAND  ☑ YES   ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>Angela Starr | CAPTION<br>First Data Corporation, TASQ Technology, Inc., First Data Merchant Services, Banc of America Merchant Services, LLC, John Does 1-10, Jane Does 1-10 & Doe Business Associations 1-10 |
|---|---|
| CASE TYPE NUMBER (See reverse side for listing)<br>618 | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ☑ NO<br>IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
| RELATED CASES PENDING?<br>☐ YES   ☑ No | IF YES, LIST DOCKET NUMBERS |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ YES   ☑ NO | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY  (if known)   ☐ NONE<br>☑ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION | | |
|---|---|---|
| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?<br>☑ YES   ☐ No | IF YES, IS THAT RELATIONSHIP:<br>☑ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain)<br>☐ FAMILIAL   ☐ BUSINESS | |
| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ☑ YES   ☐ No | | |

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| ♿ DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ YES   ☑ No | IF YES, PLEASE IDENTIFY THE  REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED?<br>☐ YES   ☑ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE: _[signature]_

Effective 08/20/2011, CN 10517-English                                                              page 1 of 2



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under *Rule 4:5-1*

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151   NAME CHANGE
175   FORFEITURE
302   TENANCY
399   REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502   BOOK ACCOUNT (debt collection matters only)
505   OTHER INSURANCE CLAIM (including declaratory judgment actions)
506   PIP COVERAGE
510   UM or UIM CLAIM (coverage issues only)
511   ACTION ON NEGOTIABLE INSTRUMENT
512   LEMON LAW
801   SUMMARY ACTION
802   OPEN PUBLIC RECORDS ACT (summary action)
999   OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305   CONSTRUCTION
509   EMPLOYMENT (other than CEPA or LAD)
599   CONTRACT/COMMERCIAL TRANSACTION
603N   AUTO NEGLIGENCE -- PERSONAL INJURY (non-verbal threshold)
603Y   AUTO NEGLIGENCE -- PERSONAL INJURY (verbal threshold)
605   PERSONAL INJURY
610   AUTO NEGLIGENCE -- PROPERTY DAMAGE
621   UM or UIM CLAIM (includes bodily injury)
699   TORT -- OTHER

**Track III - 450 days' discovery**
005   CIVIL RIGHTS
301   CONDEMNATION
602   ASSAULT AND BATTERY
604   MEDICAL MALPRACTICE
606   PRODUCT LIABILITY
607   PROFESSIONAL MALPRACTICE
608   TOXIC TORT
609   DEFAMATION
616   WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617   INVERSE CONDEMNATION
618   LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156   ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303   MT. LAUREL
508   COMPLEX COMMERCIAL
513   COMPLEX CONSTRUCTION
514   INSURANCE FRAUD
620   FALSE CLAIMS ACT
701   ACTIONS IN LIEU OF PREROGATIVE WRITS

**Centrally Managed Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 280 | ZELNORM | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 291 | PELVIC MESH/GYNECARE |
| 288 | PRUDENTIAL TORT LITIGATION | 292 | PELVIC MESH/BARD |
| 289 | REGLAN | 293 | DEPUY ASR HIP IMPLANT LITIGATION |

**Mass Tort (Track IV)**

| | | | |
|---|---|---|---|
| 248 | CIBA GEIGY | 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL |
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | 282 | FOSAMAX |
| 271 | ACCUTANE/ISOTRETINOIN | 284 | NUVARING |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 286 | LEVAQUIN |
| 278 | ZOMETA/AREDIA | 287 | YAZ/YASMIN/OCELLA |
| 279 | GADOLINIUM | 601 | ASBESTOS |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category**    ☐ **Putative Class Action**    ☐ **Title 59**

)                                )

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK         NJ 07601-7680
                                        TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 527-2600
COURT HOURS

                        DATE:   JANUARY 30, 2012
                        RE:     STARR VS FIRST DATA CORPORATION
                        DOCKET: BER L -000867 12

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 3.

     DISCOVERY IS   450 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON KENNETH J. SLOMIENSKI

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM    003
AT:  (201) 527-2600.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                        ATTENTION:
                                   ATT: BRUCE ATKINS
                                   DEUTSCH ATKINS PC
                                   25 MAIN STREET  SUITE 104
                                   HACKENSACK     NJ 07601-7032

JUBBRO1
```

**B**

DEUTSCH ATKINS, P.C.
25 Main Street, Suite 104
Hackensack, New Jersey 07601
(201) 498-0900
Attorneys for Plaintiff, Angela Starr

SUPERIOR COURT BERGEN COUNTY
FILED
FEB 14 2012

PUBLIC CLERK

| | |
|---|---|
| ANGELA STARR,<br><br>Plaintiff,<br><br>v.<br><br>FIRST DATA CORPORATION, TASQ TECHNOLOGY, INC., FIRST DATA MERCHANT SERVICES, BANC OF AMERICA MERCHANT SERVICES, LLC, JOHN DOES 1-10, JANE DOES 1-10, and DOE BUSINESS ASSOCIATIONS 1-10,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br>DOCKET NO.: BER-L-00867-12<br><br><br>Civil Action<br><br>**ACKNOWLEDGMENT OF SERVICE** |

TO:     Brian D. Lee, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960

Service of the Complaint and Jury Demand in the above-referenced matter filed on January 27, 2012 is hereby acknowledged this 9th day of February, 2012 on behalf of Defendant Banc of America Merchant Services.

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Attorneys for Defendant Banc of America Services
Merchant Services

By:     _____
Brian D. Lee, Esq.

Dated:  February 9, 2012

DEUTSCH ATKINS, P.C.
25 Main Street, Suite 104
Hackensack, New Jersey 07601
(201) 498-0900
Attorneys for Plaintiff, Angela Starr

| | |
|---|---|
| ANGELA STARR,<br><br>              Plaintiff,<br><br>v.<br><br>FIRST DATA CORPORATION, TASQ TECHNOLOGY, INC., FIRST DATA MERCHANT SERVICES, BANC OF AMERICA MERCHANT SERVICES, LLC, JOHN DOES 1-10, JANE DOES 1-10, and DOE BUSINESS ASSOCIATIONS 1-10,<br><br>              Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br>DOCKET NO.: BER-L-00867-12<br><br><br>Civil Action<br><br>ACKNOWLEDGMENT OF SERVICE |

SUPERIOR COURT BERGEN COUNTY
FILED

FEB 2 1 2012

DEPUTY CLERK

TO:   A. Stevenson Bogue, Esq.
       McGrath North Mullin & Kratz, PC LLO
       First National Tower, Suite 3700
       1601 Dodge Street
       Omaha, Nebraska 68102

Service of the Complaint and Jury Demand in the above-referenced matter filed on January 27, 2012 is hereby acknowledged this ___ day of February, 2012 on behalf of Defendants First Data Corporation, TASQ Technology, Inc., and First Data Merchant Services.

               McGrath North Mullin & Kratz, PC LLO
               Attorneys for Defendants First Data Corporation,
               TASQ Technology, Inc., and First Data Merchant
               Services

               By: _____
                     A. Stevenson Bogue, Esq.

Dated:   February ___, 2012

C

$\mathscr{Deutsch\ Atkins,\ P.C.}$

ATTORNEYS AT LAW

25 MAIN STREET, SUITE 104
COURT PLAZA NORTH
HACKENSACK, NEW JERSEY 07601
(201) 498-0900
(201) 498-0909 FAX

NEIL H. DEUTSCH[1]
BRUCE L. ATKINS, AV[02]
ANDREW M. MOSKOWITZ[1]

SHEILA E. O'SHEA-CRISCIONE[1]
LISA M. CURRY[4]
CHRISTOPHER J. CARCICH[1]
KATHRYN K. McCLURE
MARISSA BECKER RUGGIERO[1]

OF COUNSEL
CRAIG H. LIVINGSTON
LAURA G. WEISS[3]

WEBSITE: www.deutschatkins.com
E-MAIL: DALAW@deutschatkins.com

ONE BLUE HILL PLAZA
P.O. BOX 1647
PEARL RIVER, NY 10965
(845) 920-0200

650 FIFTH AVE., 17TH FLOOR
NEW YORK, NEW YORK 10019
(212) 957-8500

Please respond to the Hackensack

Office

ADMITTED IN NY & NJ[1]
ADMITTED IN NY, NJ & FL[3]
ADMITTED IN NY[3]
ADMITTED IN NJ & PA[4]

June 30, 2010

**VIA FACSIMILE 402.222.6098 & FIRST CLASS MAIL**

Lori Graesser, Esq.
Employment and Benefits Law Group
FIRST DATA CORPORATION
Suite 2000
5565 Glenridge Connector, N.E.
Atlanta, Georgia 30342

Re:    **Angela D. Starr**

Dear Ms. Graesser:

As you know, this Firm represents Angela D. Starr in matters arising from her employment with TASQ, a subsidiary of First Data Corporation ("First Data"). As set forth below, Ms. Starr has claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel and retaliation in violation of public policy against TASQ. Further, it appears that, Ms. Starr has claims for tortious interference with contract and retaliation in violation of public policy against her direct supervisor, O.B. Rawls, IV, Senior Vice President of Sales.

The facts described herein are merely illustrative. This letter is not exhaustive and does not purport to describe all facts relating to this matter.

I.    **Ms. Starr's Employment Background with TASQ**

Ms. Starr's employment background with First Data is set forth in my March 17, 2010 correspondence to Messrs. Cappellas and Bell, a copy of which you have. With regard specifically to TASQ, Ms. Starr was employed as a Regional Sales Manager from September 2006 until December 2009, during which time she enjoyed a successful career and generated substantial revenue for TASQ and First Data. For example, in 2008, Ms. Starr successfully signed approximately $16 million in contracts for TASQ and achieved the "President Club" award in acknowledgment for her outstanding sales performance despite an attempt by Mr. Rawls, described below, to prevent that success and deprive her of that award. Ms. Starr resigned her employment

Lori Graesser, Esq.
June 30, 2010
Page 2

with TASQ effective December 31, 2009, as a direct result of the events described herein that give rise to the aforementioned legal claims.

## II.   TASQ's Failure to Pay Ms. Starr $94,000.00 in Commissions

From the commencement of her employment in September 2006 until July 1, 2008, Ms. Starr earned commissions pursuant to a formula set forth in a 2006 Commission Plan (the "2006 Plan"). According to the 2006 Plan, Ms. Starr was paid an effective commission rate of 4.77% on all revenue she generated for TASQ. The commissions were uncapped and paid biannually. In 2007, Ms. Starr's quota was $1,100,000.00.

As an initial matter, TASQ has never paid Ms. Starr $31,862.00 in commission for Innovative Merchant Solutions (a.k.a. "Intuit") and $62,010.00 for TD Bank pinpad deals earned in 2008 under the 2006 Plan. In addition, as set forth in detail below, TASQ has failed to pay Ms. Starr a minimum of $145,000.00 in additional commissions in accordance with its 2006 plan.

## III.   TASQ's and Rawl's Attempt to Retroactively Change Ms. Starr's Commission Plan

On or about May 18, 2008, Mr. Rawls notified Ms. Starr that her quota for 2008 would be $3,600,000.00, a 330% increase over 2007. At that time, Mr. Rawls never mentioned a reduction in Ms. Starr's commission rate or commission caps. Ms. Starr did not object to the 330% quota increase because it translated to increased commission income to her under the 2006 Plan. For example, under the 2006 Plan in effect, if Ms. Starr achieved the $3.6 million quota, she would receive commission earnings of approximately $172,000.00.

On or about July 10, 2008, without explanation, Mr. Rawls presented Ms. Starr with a new Compensation Plan (the "2008 Plan"). Immediately prior to giving her the 2008 Plan, Mr. Rawls told Ms. Starr that he once fired an employee who "went over his head" implying that if Ms. Starr went over his head regarding the 2008 Plan, he would fire her too. In short, Mr. Rawls threatened Ms. Starr.

The 2008 Plan, a drastically different plan from the 2006 Plan, would have reduced Ms. Starr's commission rate to 1% with a cap on her $3.6 million quota. (Importantly, Ms. Starr refused to sign or accept the 2008 plan.) Shockingly, Mr. Rawls then notified Ms. Starr that the 2008 Plan would apply retroactively to January 1, 2008. As a result, Mr. Rawls told Ms. Starr that he anticipated that Ms. Starr would earn $10,000.00 in commission on over $2 million in revenue already booked as of July 10, 2008. Ms. Starr objected to numerous aspects of the 2008 Plan, most importantly, the intended retroactivity of the 2008 Plan to January 1, 2008, since Ms. Starr had completed a substantial volume of her overall 2008 sales between January and July 2008, especially after learning in May that her quota was increased 330% to $3.6 million. Indeed, Ms. Starr objected to the retroactive plan change on the basis that she reasonably believed it was illegal to do so. During a telephone call the following week, in retaliation for her objection, Mr. Rawls behaved in an extremely belligerent and abusive manner toward Ms. Starr.

Lori Graesser, Esq.
June 30, 2010
Page 3

On or about July 25, 2008, Mr. Rawls e-mailed Ms. Starr one document showing a proposed payout for Ms. Starr for the "first half" of 2008. He included a second document notifying her that the 2006 Plan terminated effective July 1, 2008, and set forth the 2008 Plan which became effective on July 1, 2008. Mr. Rawls notified Ms. Starr that the 2008 Plan superseded any and all past plans.

In response, Ms. Starr repeatedly asked Mr. Rawls to involve TASQ President Kim Fitzsimmons in their commission discussions, requests Mr. Rawls persistently ignored. Instead, Mr. Rawls told Ms. Starr that she should express any further commission concerns solely to him in writing. Further, Mr. Rawls told Ms. Starr that he was awaiting her signed acceptance of the 2008 Plan effective July 1, 2008, making clear to her that he would not discuss or respond to her concerns. In view of the threat Mr. Rawls made on July 10, Ms. Starr was afraid to bring her concerns to the attention of Ms. Fitzsimmons for fear of Mr. Rawls' retaliation.

Ms. Starr repeatedly objected to the retroactive cuts to her 2008 commissions. The "first half" payout document was, among other things, not in accord with quarterly payouts which had been approved by TASQ CFO John Mahoney. Additionally, Ms. Starr requested confirmation that commissions on accounts signed through July 1, 2008 under the 2006 Plan would be paid in accordance with the provisions of that Plan. Mr. Rawls responded to Ms. Starr, "This statement cannot be confirmed[.]" Ms. Starr was unwilling to accept the retroactive change in her commission plan because, as of August 2008, Ms. Starr's projected in-year revenue for TASQ was $5.5 million which equated to $262,350.00 in-year commission to Ms. Starr under the 2006 Plan. Additionally, by TASQ policy, new accounts were to be paid for the full 12 months from go-live date. The majority of Ms. Starr's accounts went live in April 2008 and after, thereby payable at the effective 4.77% commission rate on all revenue to TASQ through their 12 month anniversary post go-live date in 2009. Indeed, in 2008, Ms. Starr personally signed new contracts with a total value in excess of $16 million and generated brand new in-year revenue of more than $6.5 million for First Data.

IV.   **Kim Fitzsimmons' Confirmation that Ms. Starr Should Be Paid Under the 2006 Plan**

On or about August 20, 2008, Ms. Starr e-mailed Ms. Fitzsimmons regarding Mr. Rawls' untenable position with regard to Ms. Starr's unpaid commissions under the 2006 and 2008 Plans. Ms. Starr requested a confidential call with Ms. Fitzsimmons because Mr. Rawls had told her "that anyone who goes over his head gets fired." In that call, Ms. Fitzsimmons agreed with Ms. Starr that any deals signed under the old (2006) plan should be paid out for the full duration as stated in the plan they were signed under as this process had always been the standard course for all First Data divisions and, per Ms. Fitzsimmons, was "only fair." Ms. Fitzsimmons encouraged Ms. Starr to follow-up once more with Mr. Rawls and seek a teleconference with her if that effort proved unsuccessful.

On or about August 27, 2008, Ms. Starr sent Mr. Rawls a detailed e-mail objecting to the retroactive application of the 2008 Plan terms to deals signed prior to July 1, 2008. Mr. Rawls

Lori Graesser, Esq.
June 30, 2010
Page 4

remained unrelenting in his effort to deprive Ms. Starr of the full value of earned commissions under the 2006 Plan on sales completed prior to July 1, 2008. Thus, Ms. Starr was left with no choice but to address her concerns with Ms. Fitzsimmons.

In or about September 2008, Ms. Starr advised Ms. Fitzsimmons that, as a result of Mr. Rawl's conduct with regard to her commission plans and retaliatory conduct in response to her objections to the Plans, she was considering a transfer to a sales position with First Data Merchant Services ("FDMS"). On numerous occasions in late 2008, Ms. Fitzsimmons assured Ms. Starr that a transfer to FDMS was a transfer within the First Data organization. Thus, if Ms. Starr pursued the transfer, Ms. Fitzsimmons assured her she would not forfeit any commissions on the basis that she had left the Company and would continue to be paid all commissions for their full payout period.

In or about the same time, Ms. Starr had multiple conversations with Ms. Fitzsimmons wherein Ms. Fitzsimmons confirmed that TASQ would pay Ms. Starr commissions on all deals prior to July 1, 2008, in accordance with the terms of the 2006 Plan. Ms. Fitzsimmons confirmed, several times, that Ms. Starr would be paid under the 2006 Plan for the entirety of the commission payout period for the duration from go-live date. In response to Ms. Starr's concern that her direct supervisor, Mr. Rawls, might interfere with her receipt of commissions payments, Ms. Fitzsimmons assured Ms. Starr that she would be paid the subject commissions. Jonathan Maule of First Data' Human Resources department also confirmed Ms. Fitzsimmons' representations with regard to the Company's payment of Ms. Starr's commissions on no less than three separate occasions.

On or about October 30, 2008, Mr. Rawls presented Ms. Starr with another version of the 2008 Plan with terms in direct contravention with the agreement Ms. Fitzsimmons and Ms. Starr had regarding her commission payments. At that time, Mr. Rawls advised Ms. Starr that she would not be paid commissions beyond December 31, 2008 on the 2006 Plan on accounts that were signed under that Plan. Further, Mr. Rawls instructed Ms. Starr not to sign the new commission plan for July 1, 2008, or after and stated all deals signed in 2008 would be paid under the 2006 Plan. Mr. Rawls also told Ms. Starr that the Company would not pay her for third quarter commissions which were due to be paid in the November 15, 2008 payroll. Ms. Starr immediately objected to Mr. Rawls' communication which was contrary to the repeated advice Ms. Fitzsimmons and Mr. Maule provided her.

In or about early November 2008, Ms. Starr confirmed to Ms. Fitzsimmons that Brett Narlinger had made a formal offer for Ms. Starr to move to FDMS, which she wanted to accept, but only with Ms. Fitzsimmons' confirmation that she would be paid all commissions due through their duration. Ms. Starr cited several examples and Ms. Fitzsimmons reconfirmed her agreement in a November 5, 2008 e-mail to Ms. Starr wherein Ms. Fitzsimmons wrote, **"It has been approved and is a done deal. No worries it is the right thing to do."** (emphasis added.) Ms. Fitzsimmons told her to accept the job and not to worry as she would still be with First Data and that it was standard policy that commissions continue to be paid when an employee moves from division to division.

Lori Graesser, Esq.
June 30, 2010
Page 5

Ms. Starr also confirmed this information with Mr. Narlinger and Kevin Powers prior to accepting the position and they confirmed that it was standard policy that she would continue to be paid commissions division to division. Ms. Starr went so far as to call Mr. Maule to reiterate the conversation that she had with Ms. Fitzsimmons before rendering her resignation to Mr. Rawls. Mr. Maule agreed that this was standard practice and that Ms. Starr would continue to be paid on all deals signed for their full payout regardless of the fact that she was changing divisions. Indeed, Mr. Maule encouraged Ms. Starr to accept the position with FDMS. In reliance upon the foregoing representations, Ms. Starr accepted the position with FDMS with a commencement date of January 1, 2009.

According to the 2006 Plan, and representations by Ms. Fitzsimmons and Mr. Maule on behalf of First Data, in 2009 Ms. Starr earned and is owed 4.77 % commission on all revenue accounts signed in 2008 until their 12-month anniversary post go-live date. In addition, after Ms. Starr moved to FDMS, there were accounts, including but not limited to, Newtek and Squirrel Systems that had since gone live (and Commerce Bank for which Ms. Starr signed a new three (3) year agreement). For example, Ms.Starr's pindpad deal with TD Bank valued at $1.3 million was sold in 2008 and timely delivered in early 2009 and Ms. Starr received no commission which would equate to over $62,000.00, as stated above.

**V.   Mr. Rawls' Successful Effort To Sabotage Ms. Starr's Commission Payments**

On or about November 18, 2008, Mr. Rawls continued his effort to sabotage Ms. Starr's agreement with Ms. Fitzsimmons by telling Mr. Maule that he did not approve of Ms. Fitzsimmons' intention to continue to pay Ms. Starr under the 2006 Plan and did not intend to pay her. On or about December 22, 2008, Mr. Maule delivered a document to Ms. Starr which confirmed Mr. Rawls' November 18 statements. Ms. Starr made repeated efforts to meet with Mr. Maule prior to her January 1, 2009 move to FDMS. Mr. Maule was repeatedly unavailable to meet with Ms. Starr until January 15, 2009, at which time he advised Ms. Starr that he could not explain the document he provided her on December 22, but confirmed that it was TASQ's position that Ms. Starr was not owed any commission in 2009.

On or about February 24, 2009, Ms. Starr once again appealed to Ms. Fitzsimmons to prevail upon First Data to honor the commissions earned under the terms of the commission Plans and her further agreement, on behalf of First Data, to pay Ms. Starr in accordance with the rate that her commission would be paid for the duration of the Plan under which the deals were made.

When Ms. Starr finally received her TASQ commissions, after her January 1, 2009 transfer to FDMS, she received a reduced fourth quarter commission and no commission for the first and second quarter of 2009, contrary to the numerous assurances she had received described above. On or about January 19, 2009, Ms. Starr reminded Ms. Fitzsimmons in an e-mail that she "based [her]

Lori Graesser, Esq.
June 30, 2010
Page 6

decision to move to National [FDMS] only *after* confirming with you, Brett [Narlinger] and Kevin [Powers] that I would continue to be paid commission for the duration of the payout that were signed at TASQ."

In or about February 2009, in an attempt to resolve the commission dispute, which caused her severe emotional distress and financial difficulty, Ms. Starr suggested that TASQ pay her the effective rate of 4.77% for revenue on 2008 signed accounts through April 2009 which would give Ms. Starr the initial 12 months for pre-July 2008 deals on her large-revenue producing accounts. In return, Ms. Starr would agree to forego the right to "overage" on revenue which would normally be due for the balance of 2009, as well as commission after April 2009 that would be due on the accounts signed post July 1, 2008 under the old Plan. Ms. Starr noted one exception with regard to $1.3 million in customer terminals she sold to TD Bank in or about December 2008 which equipment arrived in TASQ in or about March or April 2009 for deployment and were timely delivered to the customer. Ms. Starr confirmed that she expected to receive her commission on the TD Bank sale even if the delivery ran late, which did not happen. The resolution proposed by Ms. Starr would result in a final payment by TASQ to Ms. Starr in June 2009 and full resolution of the commission dispute.

In or about April 2009, Ms. Fitzsimmons rejected the compromise and Mr. Maule advised Ms. Starr that TASQ would pay her a total commission of payment of $24,000.00 and no more. On or about June 5, 2009, in another attempt to amicably resolve this dispute, Ms. Starr advised the Company that she was willing to settle the commission dispute for a one-time, lump sum payment of $120,000.00 to end the severe emotional and financial stress this was causing her and her family. In mid-July 2009 the Company rejected Ms. Starr's settlement offer and ignored repeated additional correspondence to, among others, the prior mentioned parties and Tom Helms, SVP HR. Ms. Starr did not sign or agree to the $24,000.00 payment and the issue remains unresolved.

## VI.   Mr. Rawls' Attempt to Exclude Ms. Starr from President's Club

Immediately following Ms. Starr's December 22, 2008 conversation with Mr. Maule, noted above, the President's Club award winners were announced and, shockingly, Ms. Starr's name was not included contrary to the fact that Ms. Starr had qualified by definition for President's Club. Ms. Starr requested that Mr. Rawls look into the issue to which he responded with one word, "sure." Thereafter, Mr. Rawls did not respond to repeated follow up requests and, when confronted by Ms. Starr, told her that Finance was looking into her concern. Ms. Starr outlined in detail all of these facts to Mr. Maule who told her that he would look into them and respond to her. At that time, Ms. Starr informed Mr. Maule that her complaint was formal and should be treated as such. After Ms. Starr sent repeated e-mails to Mr. Rawls and Mr. Maule that went unanswered – and with the date of the President's Award trip approaching – Ms. Starr reached out directly to Finance who told her that they were not looking into anything and suggested she call Mr. Mahoney, TASQ's CFO. Ms. Starr contacted Mr. Mahoney who informed Ms. Starr that he couldn't discuss the situation with her.

Lori Graesser, Esq.
June 30, 2010
Page 7

Finally, on or about two days before the trip, Ms. Starr once again was left with no alternative but to once again email Ms. Fitzsimmons detailing the unfair treatment and retaliatory harassment she was suffering by being denied recognition for her successes, in addition to the constant and severe avoidance of paying commission by Mr. Rawls. While Ms. Starr did not receive a direct response from Ms. Fitzsimmons, within one hour of sending Ms. Fitzsimmons the email detailing the facts that she had more than qualified for President's Club, Ms. Starr received a call from First Data's Marketing Head congratulating her on making President's Club and apologizing for the oversight.

**VII.   Ms. Starr's Claims Against TASQ**

In order to establish a breach of contract claim, Ms. Starr must show that the parties entered into a valid contract, that TASQ/First Data failed to perform its obligations under the contract and that Ms. Starr sustained damages as a result. See, Murphy v. Implicito, M.D., 392 N.J.Super. 245, 265 (App. Div. 2007). Based upon the foregoing, Ms. Starr can easily demonstrate that TASQ/First Data breached the terms of the 2006 Plan by depriving her of earned commission payments under that Plan. New Jersey recognizes the well-settled rule that " a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Totaro, Duffy, Cannova and Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 13 ( 2007)(quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)).

Further, in Winslow v. Corporate Express, Inc., 364 N.J.Super. 128 (App. Div.2003), the Appellate Division was faced with the question as to "whether an employee has a viable cause of action against an employer for reducing his compensation by changing the method of calculating sales commissions without prior notice. " The Winslow Court concluded that an employer "may be liable for a violation of the Wage Payment Law, N.J.S.A. 34:11-4.1 to 4.14, breach of contract and common-law fraud for unilaterally reducing the commissions paid to its sales representatives without prior notice." Id. Accordingly, the above demonstrates that TASQ's attempt to retroactively reduce Ms. Starr's commission for deals signed prior to July 1, 2008, is simply impermissible under the law.

Ms. Starr also has a claim for breach of the implied covenant of good faith and fair dealing. In New Jersey, every contract also contains an implied covenant of good faith and fair dealing, under which "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Wade v. Kessler Inst., 172 N.J. 327, 340 (2002) (internal quotations omitted); see also Brundage v. Estate of Carambio, 195 N.J. 575, 608 (2008); Sons of Thunder v. Borden, Inc., 148 N.J. 396 (1997); McGarry v. St. Anthony of Padua Roman Catholic Church, 207 N.J. Super. 525 (App. Div. 1997). By virtue of Mr. Rawls' and the Company's conduct set forth above, they have violated this covenant. Additionally, this conduct constitutes retaliation against Ms. Starr for objecting to the unlawful retroactive change to her commission plans in violation of the public policy of the State of New Jersey that permits an employee to work in an environment free from such harassment and retaliation. Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980).

Lori Graesser, Esq.
June 30, 2010
Page 8

Additionally, Ms. Starr has a claim for promissory estoppel which requires that she demonstrate that the Company made "a clear and definite promise" with the expectation that Ms. Starr would rely upon it and that Ms. Starr did rely upon the promise to her detriment. See, e.g., Peck v. Imedia, Inc., 293 N.J. Super. 151, 165 (App. Div. 1996). Clearly, as stated above, Ms. Starr relied upon the representations of, among others, Ms. Fitzsimmons that she would be paid earned commissions even if she transferred to another First Data division and Ms. Starr relied upon those representations to her detriment.

## VIII. Ms. Starr's Claims Against Mr. Rawls

Under New Jersey law, Mr. Rawls' conduct constitutes tortious interference. The New Jersey Supreme Court has stated:

> An action for a tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation, free from undue influence or molestation . . . Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectation of economic advantage . . . [T]o prove its claim, plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendant's malicious interference, and that it suffered losses thereby.

Lamorte Burns & Co. v. Walters, 167 N.J. 285, 305-06 (2001) (citations omitted); see also Harris v. Perl, 41 N.J. 455, 461 (N.J. 1964)("[O]ne who unjustifiably interferes with the contract of another is guilty of a wrong.") To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must demonstrate five elements: (1) a reasonable expectation of economic advantage or benefit belonging or accruing to the plaintiff; (2) knowledge on behalf of the defendant of this expectation; (3) the defendant's wrongful and intentional interference with this expectation; (4) the reasonably probable expectation of the economic advantage had there been no interference; and (5) damages. See, Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 752 (1989).

Additionally, in Cappiello v. Ragen Precision, 192 N.J. Super. 523 (App. Div. 1984), the plaintiff's supervisors, "acting for the corporation in order to secure sizeable commissions owing to plaintiff, terminated him." Id. at 530. The Court noted that, "[a]s tortfeasors, they are personally liable, notwithstanding their corporate status." Id. Moreover, the Court noted that "[a] corporate employer may be held liable for exemplary damages if its employee who committed the wrongful act or authorized or ratified it was so high in authority as to be fairly considered executive in character." Id. at 531.

Lori Graesser, Esq.
June 30, 2010
Page 9

    The objective evidence demonstrates that Mr. Rawls retaliated against Ms. Starr for requesting her duly owed commissions. Accordingly, pursuant to <u>Lamorte Burns & Co. v. Walters</u> and <u>Cappiello v. Ragen Precision</u>, both Mr. Rawls and TASQ may be held liable for tortious interference with contractual rights.

    Additionally, as noted above, Ms. Starr has a claim against Mr. Rawls based upon his retaliation against Ms. Starr for objecting to the unlawful retroactive change to her commission plans in violation of the public policy of the State of New Jersey that permits an employee to work in an environment free from such harassment and retaliation. <u>Pierce v. Ortho Pharmaceutical Corp.</u>, 84 N.J. 58 (1980).

**IX.**    **Ms. Starr's Damages**

    As a result of the foregoing, Ms. Starr is entitled to compensatory and potentially punitive damages. Additionally, it bears noting that Ms. Starr is a single mother and the sole support of income for herself and her child. With the understanding that TASQ would pay her the commissions it owed her, and continued confirmation from Ms. Fitzsimmons, Ms. Starr made financial decisions and borrowed money in anticipation of being paid the subject commissions which she duly earned. TASQ's conduct with regard to paying Ms. Starr the commissions owed to her has caused her to incur significant financial losses and significant emotional distress.

    This correspondence hereby advises you that a potential for litigation exists regarding this matter, and demand is hereby made that all information, including but not limited to, journals, evaluations, personnel files, investigatory material, computer files and programs, hard drives, email, correspondence, and any documentation regarding Ms. Starr's employment and the circumstances identified within this correspondence are preserved as potential evidence. Any destruction of same will be regarded as spoliation of evidence.

                          Very truly yours,

                          BRUCE L. ATKINS

BLA/kkm
cc: Ms. Angela D. Starr